**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: CHARLES PHILLIP COWIN | § | |
| | § | |
| Debtor. | § | |
| | § | |
| CHARLES PHILLIP COWIN, | § | |
| | § | |
| Appellant, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-1767 |
| | § | |
| COUNTRYWIDE HOME LOANS, INC., | § | |
| *et. al.*, | § | |
| | § | |
| Appellees. | § | |

**MEMORANDUM OPINION AND ORDER**

The bankruptcy debtor, Charles Cowin, a real-estate developer, appeals from the findings and conclusions the bankruptcy court issued after a six-day adversary proceeding. The plaintiffs in that proceeding, Countrywide Home Loans, Inc. ("Countrywide"), Deutsche Bank National Trust Company ("Deutsche Bank"), Chase Home Finance, LLC ("Chase"), Wells Fargo Bank, N.A. ("Wells Fargo"), and WMC Mortgage Corporation ("WMC"), held mortgages in three Houston properties. The plaintiffs alleged that Cowin was involved in transactions designed to deprive them of their securities interests in, and any of the foreclosure sale proceeds from, the properties. The plaintiffs asserted claims under the Texas Theft Liability Act ("TTLA"), TEX. CIV. PRAC. & REM. CODE §§ 134, *et seq*., Chapter 12 of the Texas Civil Practice & Remedies Code, and the Texas Uniform Fraudulent Transfer Act ("TUFTA"), TEX. BUS. & COMM. CODE §§ 24, *et seq*. The bankruptcy court found and concluded that Cowin was liable and that these debts were

1

nondischargeable under 11 U.S.C. §§ 523(a)(4) and (a)(6).  Cowin settled with Chase, Wells Fargo, and WMC.  Countrywide and Deutsche Bank remain as appellees.

Based on the record and the applicable law, the court affirms the bankruptcy court's findings and conclusions.  The reasons are set out below.

## I.    Background

Cowin's real-estate business included acquiring tax-transfer liens that originate when, "[o]n January 1 of each year, a tax lien attaches to property to secure the payment of all taxes, penalties, and interest ultimately imposed for the year on the property . . . ."  TEX. TAX CODE § 32.01(a).  "The lien exists in favor of each taxing unit having power to tax the property."  *Id.*  A lender may pay the taxes on the property owner's behalf.  *Id.* § 32.06(a-1).  Once the lender satisfies the property owner's outstanding "taxes, penalties, and interest," the taxing unit transfers its tax lien to the lender, explaining the term, "tax-transfer lien."  *Id.* § 32.06(b).

The Texas Tax Code regulates the contracts that govern these arrangements.  Among other things, the Code specifies that the contracts between the lender paying the property taxes and the property owner, secured by a deed of trust, "shall provide" terms in the event of foreclosure.  *Id.* § 32.065(b).[1]  The Code also prohibits the lender from starting foreclosure proceedings within one year of the tax lien transfer, unless the contract provides otherwise.  *Id*. § 32.06(i).

In the event of foreclosure, tax liens take priority over most other liens, including purchase-money mortgage liens.  *Id.* § 32.05.  After a foreclosure sale, junior liens are extinguished and any

---

[1] In 2007, the Texas legislature amended the Tax Code provisions concerning tax-transfer liens.  Act of May 25, 2007 ("2007 Act"), 80th Leg. R.S., ch. 1329, §§ 1, 4, 5, 2007 Tex. Gen. Laws 4484-88.  The 2007 Act applies to transfers of, and foreclosures on, tax liens taking place on or after the Act's effective date, September 1, 2007.  The tax liens in this case were transferred before September 1, 2007.  (Docket Entry No. 3, Ex. 20 at p. 10, 12, 13).  The foreclosures occurred after September 1, 2007.  (*Id.* at 11, 12, 14).  The differences between the pre- and post-2007 versions of the Tax Code are not material to the analysis.

2

surplus funds are paid to the junior lienholders in seniority order.  *See, e.g.*, *Conversion Props., LLC v. Kessler*, 994 S.W.2d 810, 813 (Tex. App.—Corpus Christi 1999, rev. denied) ("If there are surplus proceeds generated by the foreclosure sale after paying the trustee's fees and expenses and the existing indebtedness secured by the foreclosed lien, they are distributed to inferior lienholders . . . ."); TEX. TAX CODE § 32.06(j).

The bankruptcy court found that Cowin had developed a "scheme" to benefit from the priority status Texas law gives tax-transfer liens.  (Docket Entry No. 3, Ex. 20 at p. 14).  The bankruptcy court's findings described the "scheme" in detail, setting out Cowin's history of acquiring tax-transfer liens.

Cowin made at least 19 tax-transfer loans between 2004 and 2006.  (*Id.* at 16).  He lent the money in his own name and put into place deeds of trust securing loans that specified the order of distributing proceeds in the event of foreclosure sale.  The deeds of trust listed the order as follows:

> (a) expenses of foreclosure, including a commission to Trustee of 5% of the bid; (b) to Beneficiary, the full amount of principal, interest, attorneys' fees, and other charges due and unpaid; (c) any amounts required by law to be paid before payment to Grantor; and (d) to Grantor, any balance.

(*Id.* at 17).

In 2006, Cowin began lending money through two limited-liability corporations rather than in his own name.  (*Id.*).  The first corporation, Woodway Campton, Ltd. ("WCL"), was a Texas real-estate company with two shareholders, Cowin and Woodway Campton GP, Inc.  Cowin was Woodway Campton GP's only shareholder.  The bankruptcy court found that Cowin "owned and controlled" WCL.  (*Id.* at 7).  The second corporation, Dampkring, LLC, had one member and manager, Brien West, a friend of Cowin's son.  The bankruptcy court found that West was a "figurehead" and that Cowin controlled Dampkring.  (*Id.*).  The basis for this finding included

West's testimony that Dampkring was not his idea, that he had no experience with tax-transfer liens, and that he played little role in Dampkring's day-to-day operations. (*Id.* at 7–8).

Cowin used these corporations to loan money to Allan and Nancy Groves, two of his business associates, for them to use to pay the outstanding taxes on properties they had purchased at foreclosure sales. In exchange for lending them money to pay the taxes, Cowin obtained a tax-transfer lien. (*Id.* at 15). The plaintiffs held mortgages on the properties the Groveses bought. (*Id.* at 14).

Cowin and the Groveses entered into a contract providing for loan repayment and securing the loans with a deed of trust. (*Id.* at 14–15). The deeds of trust named G.P. Matherne, another one of Cowin's business associates, as the trustee. (*Id.* at 6). The Groveses intentionally defaulted on the loans, and Cowin instructed Matherne to foreclose. (*Id.* at 10 & n.10, 12 & n.12, 14).

Cowin and the Groveses kept all the proceeds from foreclosure sales, paying nothing to the preexisting lienholders. The bankruptcy court found that Cowin had changed the text of the deeds of trust securing the tax-transfer loans he made between 2004 and 2006. (*Id.* at 17). In contrast to the pre-2006 deeds, the revised deeds ensured that proceeds from the foreclosure sales would go first toward paying Matherne's commission, next toward paying Cowin's tax-transfer loan, and last to the Groveses. The deeds of trust did not provide for any distribution to the preexisting lienholders who, by law, were due any surplus proceeds remaining after the senior lien was satisfied. *See, e.g.*, *Conversion Props.*, 994 S.W.2d at 813. The revised deeds provided that, in the event of foreclosure, proceeds from the foreclosure sale would be distributed in this order:

> (a) expenses of foreclosure, including a commission to Trustee of 5% of the bid; (b) to Beneficiary, the full amount of principal, interest, attorneys' fees, and other charges due and unpaid; (c) to Grantor, any balance.

(*Id.*).

The three Houston properties at issue were covered by tax-transfer loans and deeds of trust containing this revised language.  Countrywide held the mortgage on the first property, located at 3311 Yupon Street; WMC held the mortgage on the second, located at 3231 Allen Parkway; and Chase held the mortgage on the third, located at 6007 Memorial Drive.  (*Id.* at 5).  The bankruptcy court's findings and conclusions about each property are discussed in turn.

### A.    The Countrywide Property at 3311 Yupon Street

Erne Jackson borrowed $638,350 from American Brokers Conduit ("ABC") to purchase this property in 2006.  (*Id.* at 9).  A mortgage secured the loan in favor of Mortgage Electronic Registration Systems, Inc. ("MERS"), as ABC's nominee.[2]  (*Id.*).  The deed was recorded in the Harris County, Texas real-property records.  (*Id.*).  IMPAC Secured Assets Corp. acquired title to the deed, authorizing Deutsche Bank to serve as the trustee and Countrywide to act as the mortgage servicer.  (*Id.*).  The transfer was recorded with MERS but was not recorded in the real-property records.  (*Id.*).

Alan Groves, acting through his company Texas Realty Holdings, LLC ("TRH"), purchased the property at a foreclosure sale on August 7, 2007.  (*Id.* at 9–10 )  TRH took title to the property subject to IMPAC's mortgage.  (*Id.* at 10).  On August 23, 2007, TRH borrowed approximately

---

[2]  As one court has explained:

> MERS is the Wikipedia of land registration systems. . . . MERS members agree to name MERS as "mortgagee of record" in the appropriate public registry of deeds with respect to any mortgage that they register on the MERS database.  MERS is named as mortgagee of record in the mortgage so that beneficial ownership and servicing rights of the note may be transferred among MERS members without the need to publicly record such assignments; instead assignments of the note are tracked by MERS' [sic] electronic system.

*Culhane v. Aurora Loan Servs.*, 826 F. Supp. 2d 352, 368 (D. Mass. 2011) (citations omitted) (quotation marks omitted).

$15,000 from Dampkring to pay the outstanding property taxes on the property, plus $750 in transfer costs and attorney fees. (*Id.*). TRH and Dampkring entered into a contract for TRH to repay the $15,750, including paying the $750 by September 5, 2007—13 days after the loan was made. (*Id.*). The contract secured the loan with a deed of trust naming Matherne as the trustee. (*Id.*).

TRH defaulted, paying neither the $750 by September 5 nor paying toward the $15,000. (*Id.*). Cowin directed Matherne to initiate foreclosure proceedings. (*Id.*). On December 4, 2007, the property was sold at foreclosure for $118,000. (*Id.* at 11). Matherne received $1,000 from the foreclosure sale. (*Id.*). The $15,000 debt—which Dampkring had since transferred to Terra Development, a corporation controlled by Cowin's business associate Robert Morrow—was also paid. (*Id.* at 10–11). In accordance with the deed of trust, the remaining amount went to TRH. (*Id.* at 11). Neither Countrywide (the mortgage servicer) nor Deutsche Bank (the trustee) received any of the money, despite the preexisting mortgage. (*Id.*).

**B.      The WMC Property Located at 3231 Allan Parkway**

Matthew Parker borrowed $232,000 from WMC to purchase this property in 2006 and took out a mortgage secured by a deed of trust. (*Id.*). The deed was recorded in the Harris County, Texas real-property records. (*Id.*). TRH purchased the property at the foreclosure sale on June 5, 2007 and took title subject to WMC's mortgage. (*Id.*). On June 25, 2007, TRH borrowed approximately $6,500 from Dampkring to pay the outstanding property taxes plus $750 in transfer costs and attorney fees. (*Id.* at 12). TRH and Dampkring entered into a contract to repay the loan, with the $750 to be repaid by July 5, 2007—ten days after the loan was made. (*Id.*). The deed of trust securing the loan named Matherne as the trustee. (*Id.*).

6

TRH defaulted on the loan, paying neither the $750 by July 5 nor any of the $6,500.  (*Id.*).

Cowin instructed Matherne to initiate foreclosure proceedings, and the property was sold at

foreclosure on October 5, 2007 for $67,000.  (*Id.*).  Matherne received $1,000 from the sale,

Dampkring received $6,500, and TRH received the excess.  (*Id.*).  WMC received nothing, despite

its preexisting mortgage.  (*Id.*).

### C.    The Chase Property at 6007 Memorial Drive

Edward Montez borrowed $570,000 from WMC to purchase this property in 2005.  (*Id.* at

13).  A mortgage secured the loan in favor of MERS as WMC's nominee.  (*Id.*).  The deed was

recorded in the Harris County real-property records.  (*Id.*).  Wells Fargo acquired title to the deed,

authorizing Chase to act as the mortgage servicer.  (*Id.*).  The transfer of the deed was recorded with

MERS but not in the Harris County records.  (*Id.*).

Nancy Groves purchased the property at a foreclosure sale on May 3, 2007 and took title

subject to Wells Fargo's mortgage.  (*Id.*).  On May 10, 2007, Nancy Groves borrowed approximately

$40,000 from WCL to pay the outstanding taxes plus $750 in transfer costs and attorney fees, then

entered into a contract agreeing to repay WCL, including repaying the $750 by May 20, 2007—ten

days after the loan was made.  (*Id.* at 13–14). The contract secured the loan with a deed of trust

naming Matherne as the trustee.  (*Id.* at 14).

Nancy Groves failed to pay either the $750 by May 20 or any of the $40,000.  Cowin had

Matherne begin foreclosure proceedings.  (*Id.*).  On August 14, 2007, Nancy Groves sold the

property to Perc, LLC, which Alan Groves controlled, receiving the same amount she had originally

paid for the property.  (*Id.*).  On September 4, 2007, the property was sold at foreclosure for

$162,500.  (*Id.*).  Matherne received $1,000, WCL received the $40,000, and Perc received the

excess.  (*Id.*).  Neither Wells Fargo nor Chase received any money toward the preexisting mortgage. (*Id.*).

## II.    Procedural History

Cowin filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code on May 19, 2010.  (Bankr. Pet. No. 10-34132, Docket Entry No. 1).  In November 2010, Countrywide, Deutsche Bank, Chase, Wells Fargo, and WMC brought adversary proceedings against Cowin, seeking a determination that Cowin conspired with the Groves and Matherne; that the transactions violated the Texas Theft Liability Act, Chapter 12 of the Texas Civil Practice & Remedies Code, and the Texas Uniform Fraudulent Transfer Act; and that the resulting debts were nondischargeable. (Adv. Nos. 10-03583, 10-03584, 10-03585).  The bankruptcy court consolidated the three adversary proceeding actions for trial, (Adv. No. 10-03583, Docket Entry No. 20), and presided over a four-day bench trial in September 2011.  (*Id.* at Docket Entry Nos. 23–26).  After the plaintiffs rested, the bankruptcy court determined that further efforts should be made to compel Alan Groves's attendance and ordered the U.S. Marshals Service to locate him.   (*Id.* at Docket Entry No. 26, p. 112).

Before Groves could be located, however, the court found that Cowin had "abused the [bankruptcy] process by filing two Chapter 11 petitions within the last 2 years [without filing] a plan and disclosure statement."  (Bankr. Pet. No. 10-34132, Docket Entry No. 227).  The court dismissed Cowin's Chapter 11 case with prejudice to refiling for 180 days.  (*Id.*).  The adversary plaintiffs jointly moved the bankruptcy court to retain jurisdiction over the related state-law claims, even though the underlying bankruptcy proceeding had been dismissed.  (Adv. No. 10-03583, Docket Entry No. 29).  The bankruptcy court granted the motion, relying on Fifth Circuit precedent holding

8

that "nothing in the statute governing bankruptcy jurisdiction mandates automatic dismissal of related proceedings upon termination of the underlying bankruptcy case." *In re Querner*, 7 F.3d 1199, 1201 (5th Cir. 1993).  The court reasoned that it had already heard four days of testimony on the state-law claims and that considerations of economy, convenience, comity, and fairness provided ample basis to maintain jurisdiction.  (Adv. No. 10-03583, Docket Entry No. 33).  The court held two additional trial days in June 2012.  (*Id.* at Docket Entry No. 68, 70).

On February 21, 2013, before the bankruptcy court issued its findings and conclusions on the state-law claims, Cowin filed a voluntary petition under Chapter 7 of the Bankruptcy Code. (Bankr. Pet. No. 13-30984, Docket Entry No. 1).  The bankruptcy court determined that although the adversary proceedings had been initiated during Cowin's now-dismissed Chapter 11 case, the court's findings and conclusions also applied to Cowin's Chapter 7 case,  which was pending at the time.  (Docket Entry No. 3, Ex. 20, at p. 2 n.2).

The bankruptcy court found and concluded that Cowin was liable to the plaintiffs and that his debts arising from the state-law violations were nondischargeable.  The court entered judgment against Cowin, awarding damages, attorney fees, costs, and interest to Countrywide and Deutsche Bank for $268,477.78, (Adv. No. 10-03583, Docket Entry No. 55); to Chase and Wells Fargo for $182,704.48, (Adv. No. 10-03584, Docket Entry No. 59); and to WMC for $120,002.97, (Adv. No. 10-03585, Docket Entry No. 66).

Cowin timely appealed.  *See* FED. R. BANKR. P.  8002; (Adv. No. 10-03583, Docket Entry No. 55, 58).  Chase, Wells Fargo, and WMC settled with Cowin.  These plaintiffs and Cowin filed joint motions to vacate the bankruptcy court's judgment, dismiss the plaintiffs' claims with prejudice, and dismiss the appeal as to these parties as moot in light of the settlement.  (Case No.

9

13-1768, Docket Entry No. 13; Case No. 13-1770, Docket Entry No. 13).  The court granted the

motions.  (Case No. 13-1768, Docket Entry No. 14; Case No. 13-1770, Docket Entry No. 14).  The

only remaining adversary plaintiffs are Countrywide and Deutsche Bank.

## III.    The Issues on Appeal

Cowin identifies five issues on appeal:

1.    Whether, in light of the Supreme Court's holding in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the bankruptcy court violated Article III of the United States Constitution when it entered judgment against Cowin based on state-law causes of action.

2.    Whether the bankruptcy court violated the automatic stay, 11 U.S.C. § 362, by continuing the trial and entering judgment against Cowin after he filed for Chapter 7 bankruptcy.

3.    Whether the bankruptcy court erred in holding that the adversary plaintiffs had standing to pursue their claims.

4.    Whether the bankruptcy court clearly erred in finding that: (1) Cowin could be held liable for acts of a corporation he "controlled," Dampkring LLC; (2) Cowin instructed Matherne to initiate the foreclosure proceedings; and (3) Cowin participated in a civil conspiracy with the Groveses and Matherne.

5.    Whether the bankruptcy court erred in holding that the acts of an alleged coconspirator could be imputed to Cowin for the purpose of determining the exceptions to discharge under 11 U.S.C. §§ 523(a)(4) and (a)(6).

## IV.    The *Stern* Issue

Cowin does not dispute that the bankruptcy court had subject-matter jurisdiction over the

adversary proceedings.  *See* 28 U.S.C. § 1334(b).  Nor does Cowin dispute that the bankruptcy court

had statutory authority to declare the state-law debts nondischargeable and to enter a money

judgment against him on the state-law claims.  28 U.S.C. § 157(b)(2)(I) ("Core proceedings include

. . . determinations as to the dischargeability of particular debts."); *In re Morrison*, 555 F.3d 473,

480 (5th Cir. 2009) ("[W]e opt to follow the overwhelming authority and agree that the bankruptcy

court had jurisdiction to enter judgment against [the debtor] for the debt owed to [the plaintiff] after it found the debt nondischargeable.").  Cowin instead relies on *Stern*, 131 S. Ct. at 2620, to argue that the bankruptcy court violated Article III of the United States Constitution when it entered the judgment.

In *Stern*, the Supreme Court held that bankruptcy courts "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id*.  Although the bankruptcy court in *Stern* had statutory jurisdiction over the claim because it was a core proceeding under 28 U.S.C. § 157(b)(2)(C), the Supreme Court reasoned that the case did not fall within the "public rights" exception for cases "that Congress could constitutionally assign to 'legislative' courts for resolution," *Stern*, 131 S. Ct. at 2610, because the state-law counterclaim did not "stem[] from the bankruptcy itself" and would not "necessarily be resolved in the claims allowance process," *id.* at 2618.  Instead, resolving the counterclaim involved "the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derive[d] nor depend[ed] upon an agency regulatory regime." *Id.* at 2615.  The Supreme Court held that this action required an Article III, rather than an Article I, court.

*Stern* does not invalidate the bankruptcy court's judgment in the present case.  Unlike the state-law counterclaim in *Stern*, the adversary plaintiffs' claims "stem[] from the bankruptcy itself." *Id.* at 2618.  "Determining the scope of the debtor's discharge is a fundamental part of the bankruptcy process." *In re Carroll*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011).  The public-rights exception permits a non-Article III court to adjudicate matters "closely intertwined with a federal regulatory program." *Stern*, 131 S. Ct. at 2614 (quotation marks omitted).  The bankruptcy court

could not assess the scope of Cowin's discharge without first determining whether the plaintiffs had a valid claim. The plaintiffs needed "an allowed claim in order to participate in distributions from [the debtor's] bankruptcy estate." *In re Carroll*, 464 B.R. at 312. Resolving the state-law claims was "closely intertwined" with the bankruptcy-law issues because the bankruptcy court had to resolve the state-law claims to decide whether the resulting liability was an exception to discharge under 11 U.S.C. §§ 523(a)(4) and (a)(6). The bankruptcy court has exclusive jurisdiction to determine dischargeability. *See In re Schwager*, 121 F.3d 177, 181 (5th Cir. 1997). The adversary claims were "part of the proceedings in bankruptcy" and did not "concern controversies arising out of " or "augment[ing]" it. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989) (quotation marks omitted).

The bankruptcy court held Cowin liable and entered judgment against him on the state-law claims as part of determining whether the debts stemming from those claims were dischargeable. The bankruptcy court did not improperly exercise "the judicial power of the United States." U.S. CONST. art. III, § 1.

Case law supports this conclusion. The circuit courts addressing the effect of *Stern* on a bankruptcy court's exercise of jurisdiction under 28 U.S.C. § 157(b)(2)(I) have held that *Stern* does not make a bankruptcy court's entry of judgment on nondischargeability unconstitutional. *In re Deitz*, 760 F.3d 1038, 1050 (9th Cir. 2014) ("[E]ven after *Stern*, the bankruptcy court had the constitutional authority to enter a final judgment determining both the amount of [the plaintiff's] damage claims against [the debtor], and determining that those claims were excepted from discharge."); *In re Hart*, 564 Fed. App'x 773, 776 (6th Cir. 2014) (unpublished) ("*Stern* does not strip the bankruptcy court of its constitutional authority to enter a final monetary judgment in this

12

dischargeability action . . . ."). Several bankruptcy courts within the Fifth Circuit have followed this approach. *In re Carroll*, 464 B.R. 293, 311–12 (Bankr. N.D. Tex. 2011); *In re Soo Bin Kim*, 2011 WL 2708985, Adv. No. 11-5020-C, at *2 n.2 (Bankr. W.D. Tex. July 11, 2011).

The Fifth Circuit has twice declined to decide whether *Stern*'s holding is limited to state-law counterclaims, or whether *Stern* also applies to other core proceedings under 28 U.S.C. § 157(b)(2). *In re Frazin*, 732 F.3d 313, 319 n.2 (5th Cir. 2013) ("This court has only begun the task of interpreting the scope of *Stern*."); *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) (recognizing that *Stern* "express[ly] instruct[ed] that its holding applied in only one isolated respect" but leaving it "for future courts to flesh out the effect of *Stern* more definitively" (quotation marks omitted)). Cowin has not cited—and the court is not aware of—a Fifth Circuit case discussing the effect of *Stern* on a bankruptcy court's constitutional authority to decide and enter a money judgment on state-law claims in the process of determining the "dischargeability of particular debts." *See* 28 U.S.C. § 157(b)(2)(I).

Given the absence of binding, post-*Stern* precedent, Cowin carries the heavy burden of demonstrating that *Stern* clearly overruled pre-*Stern*, Fifth Circuit precedent making clear that the bankruptcy courts have the authority, "in addition to declaring a debt non-dischargeable, . . . to liquidate the debt and enter a monetary judgement [sic] against the debtor" on state-law claims. *In re Morrison*, 555 F.3d at 478. "[O]nly an intervening change in the law (such as by a Supreme Court case) permits a subsequent panel"—much less a district court—"to decline to follow a prior Fifth Circuit precedent." *United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013). "Such an intervening change in the law must be unequivocal, not a mere 'hint' of how the Court might rule in the future." *Id.* at 146; *see also Exxon Mobil Corp. v. United States*, – F.3d –, 2015 WL 3513949,

13

at *24 (S.D. Tex. June 4, 2015).  Cowin has not shown that *Stern* "unequivocally" overrules *In re Morrison*.  *Stern* concluded that "Congress, *in one isolated respect*, exceeded [Article III's] limitation in the Bankruptcy Act of 1984."  131 S. Ct. at 2620 (emphasis added).  The Fifth Circuit has suggested in dicta that *Stern* does not affect every category of core proceedings listed in 28 U.S.C. § 157(b)(2).  The degree of "encroachment upon the Judicial Branch" for each category requires a case-specific assessment.  *In re Renaissance Hosp.*, 713 F.3d at 294 n.12.

Even assuming, without deciding, that the plaintiffs' claims were governed by *Stern*, the bankruptcy court did not violate Article III.  The parties in this case expressly consented to the bankruptcy court's exercise of jurisdiction over the state-law claims.  The following colloquy took place at trial:

| | |
|---|---|
| THE COURT: | Would you consent to my entering a final judgment [on the state-law claims]? |
| COUNSEL FOR COUNTRYWIDE et al.: | Yes, your Honor, I would. |
| THE COURT: | Mr. Maris? |
| COUNSEL FOR WMC: | Yes. |
| THE COURT: | Mr. Colbert? |
| COUNSEL FOR COWIN: | I believe so, your Honor. |
| THE COURT: | I need a Sherman-esque either yes or no. |
| COUNSEL FOR COWIN: | Yes, your honor. |

(Adv. No. 10-03585, Docket Entry No. 66, p. 10–11).

The Supreme Court has held that "allowing bankruptcy litigants to waive the right to Article III adjudication of *Stern* claims does not usurp the constitutional prerogatives of Article III courts." *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1944–45 (2015).  The record shows that the parties' consent was knowing, voluntary, and express.  *Id.* at 1948 n.13 ("Even though the Constitution does not require that consent be express, it is good practice for courts to seek express statements of consent or nonconsent, both to ensure irrefutably that any waiver of the right to Article III adjudication is knowing and voluntary and to limit subsequent litigation over the consent issue."); *see also In re TPG Troy, LLC*, 793 F.3d 228, 233 (2d Cir. 2015) (finding express consent under *Wellness* on a similar record).[3]

The bankruptcy court did not err in entering final judgment determining the existence and amount of the state-law damages claims against Cowin and their dischargeability.

## V.     The Standard of Review

The district courts have the authority to hear appeals from the final judgments of a bankruptcy court.  28 U.S.C. § 158(a).  Ordinarily, the "traditional appellate standards" apply to the district court's review.  *Stern*, 131 S. Ct. at 2604.  "[W]hen, under *Stern*'s reasoning, the Constitution does not permit a bankruptcy court to enter final judgment on a bankruptcy-related claim, . . . a bankruptcy court [may] issue proposed findings of fact and conclusions of law to be reviewed *de novo* by the district court."  *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2168 (2014).  Because the bankruptcy court had the constitutional authority to adjudicate the plaintiffs'

---

[3]  Cowin points to the Fifth Circuit's decision in *In re BP RE, L.P.*, 735 F.3d 279 (5th Cir. 2013), which held that consent could not cure a *Stern* violation.  *Id.* at 288.  That holding has since been unequivocally overruled by the Supreme Court's decision in *Wellness*.  *See* 135 S. Ct. at 1944–45; *id.* at 1957 (Roberts, C.J., dissenting) (citing *In re BP*).

state-law claims, the court reviews the bankruptcy court's conclusions of law de novo and findings of fact for clear error. *See, e.g.*, *In re Ahern Enters., Inc.*, 507 F.3d 817, 820 (5th Cir. 2007).

"[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 293 (5th Cir. 2013) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985)). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Id.* "If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing] court . . . may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 293–94 (alterations in original). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 294.

"Factual findings based on determinations regarding the credibility of witnesses demand even greater deference because only the [bankruptcy] judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 293 (quotation marks omitted). Greater deference is owed to the bankruptcy court when it "was in a superior vantage point for findings facts." *See Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 228 (5th Cir. 1997). To receive such deference, the testimony must be "coherent, internally consistent, and facially plausible" and "not contradicted by external evidence." *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 259 (5th Cir. 2006). "If a finding is based

on a mixed question of law and fact, this court should only reverse if the findings are based on a misunderstanding of the law or a clearly erroneous view of the facts." *Id.* (quotation marks omitted).

## VI.  The Automatic Stay Issue

"The filing of a bankruptcy petition operates as an automatic stay of several categories of judicial and administrative proceedings." *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 39 (1991).  These include "the commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement" of the bankruptcy petition.  11 U.S.C. § 362(a)(1).  The automatic stay protects both creditors and debtors, because

> [w]ithout the stay, creditors might scramble to obtain as much property of the debtor's limited estate as possible.  The automatic stay prevents such a scramble by providing 'breathing room' for a debtor and the bankruptcy court to institute an organized repayment plan.  It allows for the equitable disbursement of estate property among creditors.

*In re Chesnut*, 422 F.3d 298, 301 (5th Cir. 2005) (citations omitted).

Cowin argues that the bankruptcy court violated the automatic stay by entering judgment against him while his Chapter 7 case was pending.  Countrywide responds that the automatic stay does not apply to adversary proceedings filed in the court in which the debtor's bankruptcy case is pending.

Cowin is correct that the automatic stay provision is broad.  For example, it does not distinguish between actions filed in the court in which the debtor's bankruptcy case is pending and actions filed in other courts.  A frequently cited case explains why the courts have nevertheless avoided overbroad applications of the stay:

> It is beyond serious dispute that the application of the stay to certain proceedings in the bankruptcy court would lead to absurd results.  For example, if the automatic stay

17

were construed to apply to all proceedings in bankruptcy, a creditor would need relief from the stay to file a proof of claim or even a motion for relief from the stay. As a further example, application of the stay to bar the commencement of proceedings to determine the dischargeability of a debt in the absence of relief from the stay would be unworkable in light of the short time limits within which such proceedings must be commenced.

*In re N. Coast Vill., Ltd.*, 135 B.R. 641, 643 (9th Cir. BAP 1992).

The purpose of the automatic stay is to provide the debtor with "breathing room" and to ensure an equitable distribution of assets to the creditors. That purpose is not served by staying actions filed in the home bankruptcy court. Such a broad approach to the automatic stay would prevent bankruptcy courts from performing their essential functions of exercising "exclusive jurisdiction over all of the debtor's property," ensuring its equitable distribution, and providing for "the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64 (2006).

The parties have not cited—and the court has not found—Fifth Circuit case law addressing this issue. The federal courts to have addressed this issue have held that "[t]he automatic stay does not apply to proceedings initiated against the debtor if the proceedings are initiated in the same bankruptcy court where the debtor's bankruptcy proceedings are pending." *See, e.g.*, *In re Miller*, 397 F.3d 726, 730 (9th Cir. 2005); *Sharf v. BP Liquidating, LLC*, 2015 WL 5093097, No. 14-cv-7320, at *4–5 (E.D.N.Y. Aug. 28, 2015); *In re J.S. II, LLC*, 2009 WL 889988, Bankr. No. 07-3856, at *3 n.4 (N.D. Ill. March 31, 2009). The bankruptcy courts have taken a similar view. *In re Uni-Marts, LLC*, 405 B.R. 113, 129 (Bnkr. D. Del. 2009) (collecting cases and describing this as the majority view among bankruptcy courts).

Cowin relies on a case in which the Fifth Circuit held that a federal district court's dismissal of a suit against a debtor after he filed a bankruptcy petition violated the automatic stay. *Pope v.*

*Manville Forest Prods. Corp.*, 778 F.2d 238 (5th Cir. 1985).  This case is easily distinguishable.  It does not involve the application of the automatic stay to cases filed in the court in which the bankruptcy is pending.  Overwhelming authority supports the conclusion that the home bankruptcy court is uniquely situated and that applying the automatic stay to actions filed in the home bankruptcy court would ignore these unique features, undermine the stay's intended purposes, and cause absurd results.

The district court did not violate the automatic stay in entering judgment against Cowin.

**VII.    The Standing Issue**

Cowin argues that the plaintiffs lack standing to sue.  Standing requires: "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury."  *Croft v. Gov. of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  As "the party invoking federal jurisdiction," the plaintiffs "bear[] the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.  They must meet this burden "with the manner and degree of evidence required at the successive stages of the litigation."  *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 134 (5th Cir. 2009) (quotation marks omitted).

Cowin argues that the plaintiffs have not shown that they suffered an injury in fact because they did not present written evidence at trial that IMPAC acquired title to the mortgage note and the deed on the Countrywide property.  (Docket Entry No. 3, Ex. 20 at p. 9).  The deed transfer was recorded with MERS but was not recorded in the Harris County real-property records.  (*Id.*).  At trial, evidence of the original mortgage note and deed of trust on the Countrywide property was

admitted into evidence.  (Trial Exs. 86, 99).  Lisa Alvarez, a litigation specialist familiar with the

loans involved on the Countrywide property, testified that ABC transferred the note to IMPAC, that

Deutsche Bank was the trustee, and that Countrywide was the mortgage servicer.  (Adv. No. 10-

03583, Docket Entry No. 23 at p. 46).  The bankruptcy court found that "Ms. Alvarez is a credible

witness," gave "substantial weight to her testimony," and adopted it in the findings of fact.  (Docket

Entry No. 3, Ex. 20 at p. 9, 20–21).  "Factual findings based on determinations regarding the

credibility of witnesses demand [great] deference because only the [bankruptcy] judge can be aware

of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding

of and belief in what is said."  *In re Renaissance Hosp.*, 713 F.3d at 293 (quotation marks omitted).

Cowin did not dispute the factual accuracy of Alvarez's testimony at trial and does not dispute it on

appeal.  Cowin does not claim that the bankruptcy court's factual findings were clear error.  Nor

does Cowin dispute Alvarez's credibility.

Cowin argues that Alvarez's oral testimony is not enough to show that ABC transferred the

deed and written evidence is required to establish standing to sue.  Absent a writing, Cowin asserts,

the record does not show whether the plaintiffs have a stake in the property.  Cowin cites no case

law to support this argument, instead relying on several provisions of the Texas Statute of Frauds.

TEX. BUS. & COM. CODE §§ 26.01, 26.02.

Cowin raises the statute-of-frauds argument for the first time on appeal.  A party waives the

statute-of-frauds defense by failing to timely object on that basis at trial.  *Cook v. Hamer*, 158 Tex.

164, 171 (Tex. 1958); *see also Maxey Vill., Ltd. v. Web Serv. Co., Inc.*, 2001 WL 1635605, No. 14-

00-00908-CV, at *1 (Tex. App.—Houston [14th Dist.] Dec. 21, 2001, no pet.) (not designated for

publication) ("To preserve its argument that the lease violates the statute of frauds, it was incumbent

on [the appellant] to object to the lease on this basis when [the appellee] offered the lease into evidence at trial."). Even if the statute-of-frauds defense was timely, it fails. Texas state courts have made clear that documents are not required to prove the transfer of a note and that "testimony is sufficient." *Christian v. Univ. Fed. Sav. Ass'n*, 792 S.W.2d 533, 534 (Tex. App.—Houston [1st Dist.] 1990, no writ); *see also Zarges v. Bevan*, 652 S.W.2d 368, 369 (Tex. 1983).

Cowin's argument fails for other reasons as well. The original deed which the court admitted at trial secured the mortgage in favor of MERS as nominee for ABC. (Trial Ex. 86). Under Texas law, "[w]hen, as here, the deed of trust names MERS as the nominee for the lender and its successor and assigns and the deed of trust is recorded in the local real-property records with MERS as the named beneficiary, MERS remains the mortgagee of record if the note is transferred between MERS members, and there is no requirement that the deed of trust be re-recorded each time it is transferred." *Campbell v. MERS*, 2012 WL 1839357, No. 03-11-00429-CV, at *4 (Tex. App.—Austin May 18, 2012, rev. denied) (not designated for publication); *see also Harris Cnty. v. MERSCORP Inc.*, 791 F.3d 545, 556 (5th Cir. 2015) (Under Texas law, "MERS does not have to re-record a deed of trust to maintain a perfected security interest in the property.").

The record shows that the plaintiffs suffered an injury in fact from Cowin's conduct, given their stake in the property. The bankruptcy court did not err in determining that they had standing to sue.

## VIII.   The Findings-of-Fact Issues

Cowin makes three limited challenges to the bankruptcy court's application of state law to the facts of his case. Clear error is the standard of review. *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 259 (5th Cir. 2006). First, Cowin argues that the bankruptcy court

clearly erred in finding that:  (1) he "controlled" Dampkring, one of two corporations Cowin used

to structure the allegedly fraudulent transactions; (2) he instructed Matherne to initiate the

foreclosure proceedings;  and (3) that he participated in a civil conspiracy with the Groveses and

Matherne.

Each issue is addressed below.

### A.    Cowin's Relationship with Dampkring

The bankruptcy court found that Cowin was "the one in control of Dampkring," the limited-

liability corporation Cowin used to loan Allan and Nancy Groves money to pay outstanding taxes

on the three properties at issue.  Cowin argues that the record does not show that he was involved

with Dampkring.

Brian West, the individual identified as Dampkring's only member and manager, testified

that he played a limited role in the company.  He performed only "ministerial tasks such as opening

a bank account and signing checks and other documents."  (Docket Entry No. 3, Ex. 20 at p. 7–8).

West did not know what a tax-transfer loan was.  He had never invested in real estate.  (Adv. No.

10-03583, Docket Entry No. 24 at p. 106–07).  He did not make the tax-transfer loans or provide the

money to fund the loans.  (*See, e.g.*, *id.* at 118).  West did not know Allan Groves, Nancy Groves,

or Matherne.  (*Id.* at 116, 122, 125).

West testified that joining Dampkring was not his idea.  He participated only after his friend,

Cowin's son Robert, approached him about starting a real-estate business.  (*Id.* at 108).  West

thought that Dampkring was part of Robert Cowin's work with his father at WCL, a limited-liability

company that had one shareholder: Charles Cowin.  West testified that his "understanding at the

time was that Robert Cowin was still working with Charles Cowin, and that Dampkring was some

sort of continuation of whatever they were doing." (*Id.* at 134).  When asked about the relationship between Robert Cowin and his father, West agreed that Robert Cowin "work[ed] for his father, not vice versa." (*Id.* at 142).

The bankruptcy court found Brien West credible and gave "significant weight" to his testimony despite Cowin's attempts to "discredit" West by characterizing him as "unorganized and unreliable [and as having] an alcohol problem." (*Id.* at 23–24).  Even if this testimony were true, the bankruptcy court reasoned, it supported the court's finding that West did not "establish Dampkring and run the business on his own." (*Id.* at 24).

Cowin asserts that his role in Dampkring was limited to providing "investment capital." (Docket Entry No. 5, at 25).  The bankruptcy court credited West's testimony that Dampkring was a continuation of Cowin's earlier work and that West was not involved in any significant way in the company's activities.  After Dampkring was formed, Cowin stopped making loans through WCL and used Dampkring instead.  (Docket Entry No. 3, Ex. 20 at p. 24).  Unlike West, Cowin had extensive experience with tax-transfer loans.  (Adv. No. 10-03583, Docket Entry No. 25 at p. 68).  Cowin did know Allan Groves and Matherne.  (Adv. No. 10-03583, Docket Entry No. 26 at p. 29–33; Docket Entry No. 23 at p. 96–100).  The deeds of trust Cowin used at WCL were almost identical to those used at Dampkring.  (Docket Entry No. 3, Ex. 20 at p. 17).  This evidence further supports the bankruptcy court's conclusion about Charles Cowin's role in Dampkring even though he was neither a member nor a manager.

The record does not show that the bankruptcy court clearly erred in finding that West played a minor role in Dampkring and that Cowin used Dampkring to make the tax-transfer loans.[4]

---

[4]  Cowin claims that the bankruptcy court used this finding to hold him liable for Dampkring's "actions and debts." (Docket Entry No. 5 at p. 22).  The bankruptcy court's Memorandum Opinion belies that assertion. Cowin was sued in his individual capacity.  The bankruptcy court held Cowin liable for his own conduct and

### B.    Cowin's Communications with Matherne

Cowin argues that the bankruptcy court clearly erred in finding that he directed Matherne to initiate foreclosure proceedings on the three properties.  (Docket Entry No. 3, Ex. 20 at p. 21–23). Matherne offered inconsistent testimony on this issue.  At his deposition, Matherne testified that Cowin called him and instructed him to foreclose on the properties.  (Adv. No. 10-03583, Docket Entry No. 23 at p. 115–16).  At trial, Matherne testified that he could not "swear under oath" that Cowin directed him to foreclose.  (*Id.* at 116).  Matherne's deposition testimony was admitted for impeachment.  (*Id.*).  The bankruptcy court found that Matherne was "for the most part, not a credible witness," (Docket Entry No. 3, Ex. 20 at p. 21), and that Matherne's trial testimony attempted "to protect his co-conspirators by feigning ignorance" and "to skirt responsibility for failing to distribute the excess proceeds as required by Texas law," (*id.*).

Cowin claims that the differences between Matherne's trial and deposition testimony were "perfectly understandable and reasonable."  (Docket Entry No. 5 at p. 26–27).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *In re Renaissance Hosp.*, 713 F.3d at 294 (quotation marks omitted).  "Factual findings based on determinations regarding the credibility of witnesses demand even greater deference because only the [bankruptcy] judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."  *Id.* at 293

---

the conduct of his coconspirators.  It did not hold Cowin liable for anything Dampkring did.  Cowin argues that the bankruptcy court improperly pierced the corporate veil, (*Id.*), but in this context, "[i]t is not necessary that the corporate 'veil' be pierced or even discussed," *Permian Petroleum Co. v. Barrow*, 484 S.W.2d 631, 634 (Tex. App.—El Paso 1972, no writ).  "It has long been the rule in Texas that corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation." *Holberg v. Teal Constr. Co.*, 879 S.W.2d 358, 360 (Tex. App.—Houston [14th Dist.] 1994, no writ).

(quotation marks omitted). The bankruptcy court thoroughly explained why it did not find Matherne credible and supported its findings with extensive citations to the trial testimony.

The record shows that the bankruptcy court committed no error, much less clear error, in finding that Cowin instructed Matherne to foreclose on the properties.

### C.    Cowin's Involvement in a Civil Conspiracy

The bankruptcy court based Cowin's state-law liability in part on his own conduct and in part on his participation in a civil conspiracy with Matherne, Allan Groves, and Nancy Groves.  The effect of this finding was to impute the unlawful behavior of Cowin's coconspirators to him. As a result, the bankruptcy court did not "distinguish between the actions of [Cowin] and those of Matherne, Nancy Groves, or Allan Groves."  (Docket Entry No. 3, Ex. 20 at p. 48–49); *see Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983) ("[O]nce a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination.").

Cowin asserts, without explanation or support, that "the necessary elements for a conspiracy finding are not present in this case."  (Docket Entry No. 5 at p. 27).  "A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it."  *United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) (quotation marks omitted).  Cowin has waived his argument about the bankruptcy court's state-law civil conspiracy finding, and in any event, the record supports the finding.

### IX.    The Dischargeability Issue

Cowin challenges the bankruptcy court's conclusion that the debts were nondischargeable under 11 U.S.C. §§ 523(a)(4) and 523(a)(6).  (Docket Entry No. 3, Ex. 20 at p. 69–83).  "[T]he issue

25

of nondischargeability [is] a matter of federal law governed by the terms of the Bankruptcy Code." *Grogan v. Garner*, 498 U.S. 279, 284 (1991). The plaintiffs must "establish by a preponderance of the evidence that [their] claim is not dischargeable." *Id.* at 287. "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *In re Hudson*, 107 F.3d 355, 356 (5th Cir. 1997). At the same time, the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor." *Grogan*, 498 U.S. at 287 (quotation marks omitted).

Debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" are excepted from discharge. *See* 11 U.S.C. § 523(a)(4). Debts are excepted from discharge under § 523(a)(6) when they are "for willful and malicious injury by the debtor to another entity or to the property of another entity." A "debt" includes "liability on a claim." 11 U.S.C. § 101(12). A "claim" is "a right to payment," *id.* § 101(5)(A), which "is nothing more nor less than an enforceable obligation," *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998) (quotation marks omitted).

The bankruptcy court concluded that the debts fell within the larceny exception and the willful-and-malicious-injury exception, but not the embezzlement exception. (Docket Entry No. 3, Ex. 20 at p. 70–84). Cowin argues that the bankruptcy court erred in imputing "intent from a co-conspirator" to him. Cowin asserts that he lacked "the necessary intent . . . to commit larceny" or to commit a willful and malicious injury. (Docket Entry No. 5 at p. 20–24). Cowin's broader point is that the court must find individual intent on the debtor's part before applying the exception-to-discharge statute.

26

Contrary to Cowin's argument, §§ 523(a)(4) and (a)(6) do not "focus on the specific intent and actions of a debtor." (*Id.* at 21). The statute "focuses on the character of the debt, not the culpability of the debtor or whether the debtor benefitted from the fraud." *In re M.M. Winkler & Assocs.*, 239 F.3d 746, 749 (5th Cir. 2001). The relevant questions are whether, as a matter of federal law, the "*debt* [is] . . . for . . . larceny" and whether the "*debt* [is] . . . for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §§ 523(a)(4) and 523(a)(6) (emphasis added). "It is clear that 'debt for' . . . means 'debt arising from' or 'debt on account of' . . . ." *Cohen*, 523 U.S. at 220. "Thus, the plain meaning of the statute is that debtors cannot discharge any debts that arise from [larceny or willful and malicious injury] so long as they are liable to the creditor for the [larceny or willful and malicious injury]." *See M.M. Winkler*, 239 F.3d at 749.

Cowin does not dispute the bankruptcy court's conclusion that his state-law debts meet the criteria for "larceny" and "willful or malicious injury" under federal law. His only argument is that because he is liable for those debts under state civil-conspiracy law, they cannot be viewed as nondischargeable under §§ 523(a)(4) and (a)(6). *See id.* at 751. The Fifth Circuit has rejected a similar argument, holding that liability imputed to an "innocent" debtor under state partnership law did not make the resulting damages and debt dischargeable under 11 U.S.C. § 523(a)(2)(A) because "whether the debt arises from fraud is the *only* consideration material to nondischargeability." *Id.* at 749 (emphasis added) (citing *Cohen*, 523 U.S. at 217–20). The court reasoned that "Congress's choice of words [in the exception-from-discharge statute] effectuates important state law policies regarding imputed liability." *Id.* at 751. So too here. "Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable;

27

rather, it is a means for establishing vicarious liability for the underlying tort." *Beck v. Prupis*, 529 U.S. 494, 503 (2000) (quotation marks omitted) (interpreting the scope of the civil RICO statute using "the well-established common law of civil conspiracy").

The bankruptcy court identified three overt, illegal acts forming the basis of the civil conspiracy: (1) "[failing] to pay the Plaintiffs the excess proceeds to which they were entitled . . . in violation of the TTLA"; and "causing the Tax Transfer Deeds of Trust to be recorded against the Countrywide Property . . . solely for the purpose of being able to foreclose those liens and then depriving the Plaintiffs of their security interests in the properties and in the proceeds from the foreclosure sales . . . in violation of" (2) "Chapter 12 of the Texas Civil Practice and Remedies Code" and (3) "the TUFTA." (Docket Entry No. 3, Ex. 20 at 48). The liability stemming from these acts can be "larceny" or a "willful and malicious injury" even if it arises from Cowin's participation in a plan he devised and then executed with the Groveses and Matherne.

Cowin points to *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754 (2013), in which the Supreme Court defined "defalcation" under § 523(a)(4) to include "not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent." *Id.* at 1759. The Court emphasized that defalcation's statutory "neighbor"—larceny—requires "felonious intent." *Id.* at 1760 (citing *Moore v. United States*, 160 U.S. 268 (1895)). But Cowin does not argue that his violations of the Texas Theft Liability Act or the Texas Uniform Fraudulent Transfer Act lack the intent necessary to qualify as "larceny" or "willful and malicious injury." Instead, his argument is that because liability for those violations is based on conspiracy, the debts are dischargeable. Cowin does not cite case law in support of this argument, and bankruptcy courts have held that debts arising from a civil conspiracy may be

nondischargeable.  *E.g.*, *In re Markarian*, 228 B.R. 34, 39 (1st Cir. BAP 1998) ("[S]ection 523(a)(2)(A) may include debts which arise from the wrongful acts of conspirators and their co-conspirators.").  In addition, the court in *M.M. Winkler, see* 239 F.3d at 751, held that theories of imputed liability are consistent with 11 U.S.C. § 523.

The bankruptcy court did not err in holding Cowin's debts nondischargeable.

## X.    Conclusion

The bankruptcy court's order of April 25, 2013, (Docket Entry No. 3, Ex. 20), is affirmed. This case is dismissed, with prejudice.

SIGNED on September 29, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

29